OPINION OF THE COURT
Nora Freeman, J.
Due to the severity of the injuries sustained by the infant, the gravity of the charges filed against the respondent parents, and the time required to obtain medical evidence, the trial of this child abuse case was protracted. The petitions filed on February 9, 1995 allege that two-month-old Lucas D. suffered at least 17 broken bones while in his parents’ care, including fractures to the clavicle, eight ribs, tibia, humerus, both femors and "possible” (later confirmed) skull fracture. At the time of diagnosis, the respondent parents denied any wrongdoing and could offer no explanation for the baby’s injuries. They subsequently argued that their baby suffers from osteogenesis imperfecta (OI), a condition characterized by "brittle bones.” After a five-day hearing at which six witnesses testified and 14 exhibits were received in evidence, the court rejects 01 as an explanation and concludes that Lucas was abused while in the care of the respondents. Findings of abuse are entered against both parents; petitioner is directed to prepare an investigation and report; mental health evaluations of the respondents and Mathew, the older child, are to be submitted; and the case is adjourned for a dispositional hearing on April 30, 1996. Orders governing remand of the children and parental visitation are continued.
PROCEDURAL HISTORY
When the petitions were filed on February 9, 1995 the parents were represented jointly by privately retained counsel, who also appeared on February 17 and April 10, to request adjournments to permit additional medical examinations of both children by doctors selected by the parents. On June 7, the date when results of a sophisticated genetic test requested by the parents were anticipated, the parents, now claiming indigence, requested assignment of publicly funded counsel. Experienced Family Court attorneys were assigned pursuant to article 18-B of the County Law to the respondents, and the case was adjourned again in anticipation of receipt of the genetic test results.
On July 13, some five months after the petitions were filed and the children removed from their parents’ care, the genetic test (recognized as the most sophisticated diagnostic tool in *999 detecting OI, and available only from a laboratory in Seattle, Washington) was still incomplete. Upon oral motion made by respondents’ counsel, the court authorized payments from funds available under section 722-c of the County Law for the "conclusive” genetic test and for examinations by Dr. Leon Root and Dr. Jessica Davis in New York City. By stipulation, the genetic test results were to be forwarded to the court and made available to all counsel. The case was again adjourned for trial.
The genetic test results were received by the court on September 11, and sent immediately to all counsel.[1] The fact-finding hearing began on September 15, 1995, with testimony from the investigating caseworker and acceptance into evidence of several medical records.
Two medical experts testified for the petitioner on October 2 and 19, after which petitioner rested. The case was adjourned to November 9 for testimony by respondents’ three witnesses.
On November 9 respondents requested an adjournment to the third week in January, when their medical witness would be available. (Counsel stated their preference to call the expert witness before the two parents testified.) The request was denied, and the hearing continued, with testimony by both parents. A "control date” was set for November 20, in order to schedule the expert’s testimony and the Law Guardian’s case.
On December 22 respondents’ medical expert testified, completing respondents’ case. The Law Guardian then offered two exhibits and rested without calling witnesses. The Law Guardian supports the petitioner, and requests findings of abuse against both parents. Written summations were ordered submitted by January 25, with rebuttals due February 1, 1996.
Summations and rebuttals were timely filed, but the case was recalendared on February 21 for the Law Guardian’s motion to strike a portion of the father’s rebuttal, on the grounds it contained matters not in evidence. After argument, the motion was granted, and one paragraph on pages 4-5 of respondent father’s "rebuttal comments” was stricken.
FINDINGS OF FACT
Having observed the demeanor and assessed the credibility of the six witnesses, and after reviewing the trial testimony *1000 and numerous exhibits, the court makes the following findings of fact:
Osteogenesis imperfecta is described by the three physicians who testified at trial as an extremely rare condition, observed in approximately one birth per 250,000. The bones of a newborn afflicted with the most severe form of OI will fracture during the birth process and also during routine handling. Such a baby is unlikely to survive infancy. Milder forms of OI result in repeated fractures which may be reduced by careful training for the caretakers. Diagnosis of OI is based on several factors, including genetic history (parents and siblings); the type of fractures (typically, the long bones are fractured in more than one site); presence of "Wormian bones” in the skull (irregularities in the frontal sutures, visible in x-rays); blue or bluish sclerae; and a triangular shape to the face. In addition to clinical observations, OI can also be confirmed by various blood tests for the child and parents. The most sophisticated test, performed only rarely, requires a biopsy from which unusual levels of collagen can be detected. That test (the Seattle biopsy) was requested by the parents soon after the petitions were filed, and payment for it was ultimately authorized at public expense. The Seattle biopsy is recognized as conclusive in 85% of cases, meaning that 15% of such test results will be negative despite the patient actually having OI.
Lucas was born to Shari and Anthony D. on December 3, 1994 at Long Island Jewish Hospital (LIJ). The LIJ medical records indicate an unremarkable delivery, and discharge of mother and baby on December 5. The records contain no notation of any medical concerns relating to possible indicators of OI: blue or bluish sclerae, injuries at birth, or low collagen levels.
Lucas was cared for at home by his mother and father (who was working part time), and received regular follow-up care at the "well baby” clinic at LIJ, with visits in December and on January 20. The family was also visited by LIJ’s Visiting Nurse Service (VNS) from December 5 to December 8. The VNS records also contain no notations relating to collagen levels, blue sclerae, or any other abnormality. After Mrs. D. underwent surgery on January 20-21, 1995, a family friend stayed with the family for about a week and assisted the parents with Lucas’s care. The parents denied to the investigating caseworker that their friend had mistreated the baby, and did not call her as a witness.
On February 4, 1995 the parents brought Lucas to the emergency room at North Shore University Hospital (NSUH). He *1001 was then precisely nine weeks old. Mrs. D. testified that she had observed restricted mobility and swelling of the baby’s right thigh while changing his diaper. X-rays taken at NSUH on February 4 revealed 20 fractures; x-rays taken on February 15 confirmed three to four additional fractures.
The investigating caseworker testified that during interviews conducted separately with each parent immediately after the baby was hospitalized, neither could offer any explanation for the fractures. Each parent emphatically denied injuring the baby in any way, although both recalled an incident some weeks earlier when the father, falling asleep on a sofa while holding the baby on his chest, had permitted the baby to drop onto the carpeted floor, a fall of about 18 inches.
Credible testimony by NSUH’s Dr. Deborah Jenssen, an expert in pediatrics and child abuse, and Dr. Jack Levenbrown, an expert in pediatric radiology, established that Lucas’s fractures were between one and three weeks old (placing their occurrence between January 14 and 28); that none of the fractures was old enough to have been sustained at birth; that several, described as "bucket-handle fractions,” were typical of child abuse; that blood tests to detect genetic abnormalities were negative; that there was no known family history of 01; that there was no sign of the "Wormian bones” characteristic of OI; and that the baby suffered no further fractures during his hospitalization.[2] Based on their findings, both doctors "unequivocally” ruled out OI as a diagnosis, and concluded to a reasonable degree of medical certainty that the injuries to the baby were caused by trauma inflicted by an adult. Both doctors also testified that they learned subsequently that the baby had not suffered any new fractures after his discharge from the hospital to a series of foster homes, and that the Seattle biopsy was negative. Each doctor testified that those two additional factors supported and strengthened their conclusions, reached months earlier, that there was no medical support for a diagnosis of 01, "none whatsoever.”
The parents testified that medical staff at LIJ, where Lucas was born, had warned them when the baby was discharged of some concerns about his collagen and bilirubin levels. Mrs. D. also testified that the visiting nurse had examined the baby and taken blood samples in order to monitor the collagen *1002 levels. Their testimony is unpersuasive. Neither the hospital records nor the VNS records contain any mention of collagen levels. Further, respondents’ own expert testified that it is impossible for a visiting nurse to "test” or "monitor” collagen levels.
Testifying as an expert in pediatric orthopedics, and with 15 years’ experience as Director of the 01 clinic at the Hospital for Special Surgery (HSS), Dr. Leon Root testified that in his opinion Lucas suffers from a "mild” form of 01. His testimony is undermined by several factors. First, he conceded he was unsure whether he had reviewed all of the baby’s medical records. Second, he appeared to consider it significant that the baby had not suffered retinal damage or a skull fracture, injuries he described as "highly indicative” of child abuse. However, the NSUH x-rays in fact show a skull fracture, and Dr. Jenssen, who, unlike Dr. Root, was qualified as an expert in child abuse, testified that retinal damage, although common in "shaken baby” cases, would be less likely to accompany the twisting, rotational fractures sustained by this baby. Dr. Root’s credibility is also undermined by his reliance for information solely on the parents ("as well as the attorney, who was present during all discussions”). (See, exhibit 3.) He conceded on cross-examination that if the information supplied by the parents were shown to be unreliable, or if the child had sustained a skull fracture, he would reconsider his diagnosis. Dr. Root did not consult with the physicians at NSUH or with Dr. Haldelsman at LIJ, who examined Lucas at the parents’ request, and whose report concludes that abuse caused the baby’s injuries. Finally, it is troubling that Dr. Root’s December 22 testimony was noticeably more certain than the HSS report. That report, dated March 13, 1995 states that Dr. Root "feels that his overall impression is that this is a case in which 01 could not be ruled out, within the currently held information. He indicates that from an overall perspective, the patient, should he have a case of 01, in [sic] significantly mild form, and the scenario of the number of fractures would be unusual * * * In addition, the sclerae, although blue, certainly a characteristic of 01, can be seen in young children of this age, as the thickness of the sclerae increases with age. In addition, the patient does not have the characteristic bony morphology with the triangular shaped faces of this 01 illness. Dr. Root indicates he will await the results of the skin biopsy [the Seattle test] and if this were positive, it would likely settle the issue. If this were not positive, it would not completely rule out *1003 the issue, as this is not a 100% perfect test. In addition, Dr. Root comments that the metaphyseal location of a number of these fractures is also not overwhelmingly consistent with OI.”
Although aware that the Seattle biopsy result was negative, and also that Lucas had sustained no new fractures during the 10 months since he had been removed from the respondents’ care, Dr. Root held to his diagnosis of "mild OI,” with a period of remission coinciding with the baby’s foster care placement. The court does not accept Dr. Root’s "spontaneous remission” theory, for which the only support was his claim that, "I’ve seen it happen.” (Recently, Hon. David F. Jung of Fulton County Family Court rejected a similar "temporary brittle bone” defense in Matter of Daum v Daum, NYLJ, Dec. 28, 1995, at 35, col 5.) Dr. Root conceded that the "bucket handle” fractures, which he described as "twisting,” "shearing,” or "rotational” fractures, were "very specific to child abuse.” However, in his opinion it is "possible” for a child with OI to sustain bucket handle fractures; he gave as an example a fall from a bicycle. (Lucas was only nine weeks old and unable even to turn himself over when his two dozen fractures were revealed.) Dr. Root’s testimony concluded with his statement that "OI cannot be ruled out in this case” because "the parents should be given the benefit of the doubt”.
ANALYSIS AND CONCLUSIONS
The Family Court Act provides clear statutory guidance for cases such as this. Section 1046 (a) (ii) states that "proof of injuries sustained by a child * * * of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect.” Once such an injury is established, the respondent has the burden of coming forward with an adequate explanation for the injuries. (See, Matter of Tashyne L., 53 AD2d 629 [2d Dept 1976]; Matter of Shawniece E., 110 AD2d 900 [2d Dept 1985]; Matter of New York City Dept. of Social Servs. [H. & J. Children] v Carmen J., 209 AD2d 525 [2d Dept 1994].) Notwithstanding the respondents’ obligation to come forward with an explanation, the ultimate burden of proof remains the petitioner’s.
Despite the vehemence of the respondents’ denials and their prolonged search for medical evidence to support their theory, the application of the statute to the facts in this case leads to only one conclusion: that the injuries sustained by Lucas were *1004 caused by parental abuse. The evidence is overwhelming. The testimony of Doctors Jenssen and Levenbrown, rejecting 01 and concluding that Lucas was the victim of child abuse, was clear, thorough, and unequivocal. The report prepared by Dr. Handelsman at the parents’ request reached the same conclusion. Respondents’ case, limited to simple denials and testimony by an expert whose credibility was seriously diminished on cross-examination, fails to rebut the prima facie evidence of abuse. The fact that the Seattle biopsy is "only” 85% accurate is insufficient to produce a different result. The 85% accuracy of that test, plus all the other evidence, establishes abuse by clear and convincing evidence.
This is not a criminal prosecution in which culpable parties may be convicted of crimes and face incarceration. It is a civil proceeding governed by the Family Court Act "to help protect children from injury or mistreatment”. (Family Ct Act § 1011.) The petitioner’s burden is not "proof beyond a reasonable doubt”, as in a criminal case, but by "a preponderance of the evidence.” (Family Ct Act § 1046 [b] [i].) That burden can be met even if the identity of the actual abuser is never established. (See, Matter of Ruth McI, 140 AD2d 255 [1st Dept 1988]; cf., People v Wong, 81 NY2d 600, 607 [1993] [in which the Court of Appeals reversed homicide convictions of both defendants because "there was no evidence tending to show which of the two accused individuals was the abusive actor” who caused the death of the three-month-old baby left in their care].)
Accordingly, the court concludes that both respondents inflicted or allowed to be inflicted numerous fractures sustained by their son Lucas. (Family Ct Act § 1012 [e] [i].) Further, because the abuse was severe and repeated, and because both parents have not only refused to accept responsibility for the injuries, but have attempted to mislead both the medical experts and the court by falsifying important medical history, a derivative finding of abuse is also entered as to Lucas’s four-year-old half-brother Mathew (Family Ct Act § 1046 [a] [i]; Matter of Christina Maria C., 89 AD2d 855 [2d Dept 1982]; Matter of Shaina & Sachna S., NYLJ, Oct. 24, 1991, at 31, col 31).

. The transmittal letter from the Seattle lab to Dr. Davis in New York City is dated July 7; Dr. Davis’s cover letter forwarding same to the court is dated August 31; and it was not received until September 11, 1995. No explanation was ever offered for the nine-week delay in providing the genetic test results to the court.

. Dr. Levenbrown testified that the fractures revealed in the February 15, 1996 x-rays were roughly the same age as those revealed on February 5; the later x-rays, taken from different angles, simply revealed fractures that were indistinct in the earlier films.