Matter of Seaver (2006 NY Slip Op 51135(U))

[*1]

Matter of Seaver

2006 NY Slip Op 51135(U) [12 Misc 3d 1170(A)]

Decided on April 10, 2006

Family Court, Saratoga County

Abramson, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 10, 2006

Family Court, Saratoga County
In the Matter of Julia Seaver (DOB. 10/18/03), a Child under 18 years of Age Found to be Severely Abused by Diana Seaver and Francis Seaver, (Fictitious Names), Respondents.
In the Matter of Julia Seaver (DOB 10/18/03) Sam Seaver (DOB 03/20/00) LISA SEAVER (DOB 12/10/01), Children Under the Age of 18 Years Alleged to be Neglected by Francis Seaver and Diana Seaver, Respondents.
In the Matter of the Commitment of Guardianship and Custody pursuant to Section 384-b of the Social Services Law of Julia Seaver (DOB 10/18/03), A Child under the Age of 18 Years, Alleged to be a Severely Abused Child Diana Seaver and Francis Seaver, Respondents.
20541

Stacey L. Gorman, Esq.
Assistant County Attorney
Attorney for Petitioner
Municipal Center
Ballston Spa, NY 12020
and
Paul Pelagalli, Esq.
Assistant County Attorney
Attorney for Petitioner
Municipal Center
Ballston Spa, NY 12020
Mark Kassner, Esq.
Law Guardian
1334 Union Street
Schenectady, NY 12308
Gordon, Tepper & Decoursey, LLP
Eleanor M. DeCoursey, Esq.
Attorney for Respondents
113 Saratoga Road
Glenville, NY 12302
Kindlon & Shanks, P.C.
Laurie F. Shanks, Esq.
Attorney for Respondents
100 State Street
Albany, NY 12207
Friedman & Molinsek, P.C.
Stephen L. Molinsek, Esq.
Attorney for Richard and Kathleen Flanagan P.O. Box 69
Delmar, NY 12054

Gilbert L. Abramson, J.
These matters came before the Court for a dispositional hearing upon the Court's decision after trial of March 22, 2005 adjudicating the child Julia to be severely abused and that the children Sam and Lisa were derivatively neglected. A decision and order to this effect was entered July 22, 2005.
The dispositional hearing was conducted over thirteen (13) trial days between August 9, 2005 and February 14, 2006. At the conclusion of the proof, the parties were directed to submit proposed orders to the Court by February 28, 2006 with any rebuttals to the proposed orders and any written summations to be received by the Court by March 14, 2006. The proposed orders, rebuttals and summations were timely received by the Court.
As was true during the fact finding, all parties, as well as the intervening foster parents, were represented by competent and skilled counsel.
Counsel for the respondents moved to reopen the proof at the fact-finding to hear the testimony of two additional medical experts, Dr. Leon Root and Dr. Thomas Lehman. This motion was denied as these two experts were available to the respondents prior to the close of proof in the fact finding. The testimony of these two experts was received into evidence in the disposition phase of this case. Based upon the Court's receiving Dr. Root and Dr. Lehman's testimony into evidence, the petitioner was permitted to call their own medical expert, Dr. Paul Kleinman, as a rebuttal witness.
All three doctors were permitted to testify via videotaped depositions whereupon counsel for the parties was present for the questioning of these witnesses. The videotapes and the transcripts of the depositions were received into evidence. Objections to questions and answers are noted in the transcribed record.
Department of Social Services Caseworker Kristy Neal testified regarding positive supervised visits between the respondent parents, Diana and Francis Seaver and Julia. Ms. Neal testified that Diana gave consent for the foster parents (Dr. and Mrs. Sandoval) to vacation in Florida with Julia with the Sandovals' own children. Ms. Neal testified that during visits Diana would bring photographs of Julia's siblings to her and told Julia of her brother and sister's love for her. Also received into evidence was a picture book created by Diana entitled, "Who Misses Julia" which Diana would bring to all visits with Julia.
Ms. Neal stated that for most of Julia's tenure in Foster Care, Diana did not bring the siblings for visits with Julia. The Court finds Diana's explanation that, at least initially, she did not know that she could bring Julia's brother and sister to the visits not credible.
It is noted, however, that more recently Diana and Francis did bring the siblings to visits with Julia and that those visits were enjoyed by all three children.
Dr. Elizabeth Critz Schockmel, a noted forensic psychologist, was called by the respondents and her report was received into evidence.
[*2]
Dr. Schockmel reviewed the entirety of this Court's records on this matter as well as two binders of material from the respondents, one containing medical information and the other containing "family related" materials. Dr. Schockmel interviewed both Francis and Diana Seaver, all three Seaver children, Mr. and Mrs. Flanagan (the children's aunt and uncle who have petitioned for the adoption of Julia), and the Flanagans' two college-age daughters.
Dr. Schockmel's testimony, like her report, gives the Seavers high marks as parents stating that they could "teach parenting classes". As regards the Flanagans, she found them to be bright, able and deeply committed to family.
Dr. Schockmel opined that the risk to Julia of termination of her parents' rights to her would be "traumatic" but more so on Julia's siblings then upon Julia.
Dr. Schockmel testified that the Flanagans' daughters were unaware of Julia's injuries.
On cross-examination, Dr. Schockmel testified that she did not interview Julia's foster parents with whom she had resided for sixteen (16) months as of the date of the forensic interviews and that she was not retained for that purpose. She acknowledged that she did not contact Drs. Slavin, Sanchez and O'Brien, all of whom treated Julia, as "no releases went out" and "that exploration of these collateral courses would not be appropriate as the fact finding of severe abuse was already done".
The Court concurs with Dr. Schockmel's assessment of the scope of her forensic assessment and limits the input of her report and her testimony to two issues: 1) the fitness and suitability of the Flanagans to care for Julia; and, 2) the psychological value of Julia maintaining contact with her siblings should Julia not be returned to the custody of her parents. Within that limited content, Dr. Schockmel opined that the current psychological literature supports the conclusion that a child may have multiple attachment figures in their lives which may include parents, relatives and foster parents of extended duration as is in this case.
Dr. Schockmel opined that Julia's injuries were likely not the result of Munchausen's Syndrome by Proxy based upon her review of the pertinent literature and her interviews with Julia's parents. She offered that the behavioral aspects of parents or custodians who caused injuries to their children by reason of Munchausen's Syndrome by Proxy were well understood and noted in the literature. She testified that Julia's parents did not meet the majority of the criteria recognized as characteristic of the Syndrome.
It is noted that Dr. Schockmel's testimony and report cannot and do not reach issues of whether Julia's injuries were intentionally inflicted or attributable to some medical disease or condition. That issue is properly left for the Court's consideration of the testimony at fact-finding and of the additional medical testimony discussed below.
The petitioner called two non-expert witnesses, Virginia Lee and Joanne Tracozzi who testified that a warm, caring and loving relationship between the Sandovals, their children and Julia existed. The Court finds these witnesses to be credible notwithstanding the fact that Ms. Lee's husband, Arthur, is a partner in Dr. Sandoval's medical practice.
Dr. Louis Sandoval, one of Julia's foster parents, (together with his wife Michelle) testified for the petitioner. He reported that he is a family physician of sixteen (16) years and that he has been married to his wife Michelle since 1991. The Sandovals have two children, ages eleven (11) and eight (8) and that their household in Rexford, New York also consists of two dogs and their foster child of eighteen (18) months, Julia.
[*3]
Dr. Sandoval testified regarding his motivation to become a foster parent. He told of how he and Michelle were moved to "give back" to the community after he witnessed the loss of a patient's family, (parents and children) to a fire. He remarked that he did not become a foster parent initially for the purpose of adopting, previously receiving only emergency short term foster care placements.
Upon receiving Julia from Sunnyview Rehabilitation Hospital, Dr. Sandoval stated that Julia was a "quiet" baby. However, once at home where he or his wife would walk by Julia's crib when she was sleeping, Julia would startle awake and start crying hysterically. This behavior has allegedly long since abated. He testified that his children have developed a "sibling love" for Julia. When Julia first came into the Sandovals' care she was an infant and now she is a fully ambulatory toddler and frequently runs.
Dr. Sandoval testified that since Julia has been in the care of he and Michelle there have been no further fractures. This undisputed fact is of critical importance to the Court.
It was pointed out on direct examination that the foster parent application filed by Dr. Sandoval and his wife indicated that they would foster children without long term desire to adopt.
Dr. Sandoval testified that within one month of receiving Julia into his and Michelle's care, Foster Care Senior Caseworker Stacy McVeigh contacted him and informed him that Julia may ultimately be freed for adoption and if he did not wish to be considered as a pre-adoptive placement, he would have to notify the Department of Social Services for Julia to be considered for removal to a pre-adoptive foster care placement.
Upon consultation with his wife and children, it was agreed that the Sandovals would be willing to adopt Julia if she were ultimately freed for adoption.
Dr. Sandoval testified that he was aware that Julia has two siblings, Sam and Lisa, and that he would comply with any Court order that directed either no contact with the siblings or direct sibling visitation.
On cross-examination, Dr. Sandoval disclosed that he met Fran and Diana for an hour and opined to case worker, Kristy Neal, that "they are sociopaths". Upon cross-examination he stated that although he is not a psychiatrist or psychologist, it only takes him fifteen minutes to diagnose a mental illness.
Although the Court finds this to be a startling confession from a licensed medical professional, the context in which it was offered must be appreciated.
Dr. Sandoval believes, as does the Court, that Julia's injuries were inflicted and Diane and/or Francis were responsible for those injuries. The Court finds that Dr. Sandoval's diagnosis of sociopathology was emotionally and not clinically derived.
The relevance of Dr. Sandoval's statement to this, the dispositional phase of this case, is whether Dr. Sandoval's statement and the emotional input behind it renders the Sandoval family unable to foster and maintain a meaningful relationship between Julia and her brother and sister should Julia be freed for adoption and the Sandovals be chosen as the adoptive parents..
When asked if he would facilitate contact between Julia and members of her extended family, i.e. grandparents, cousins, aunts and uncles, Dr. Sandoval replied "I would do it if I was told that it was in Julia's best interest". The Court finds this representation by Dr. Sandoval credible but would not find this statement credible if contact with Julia's extended family also [*4]meant access, or risk of access, to Julia's parents.
Michelle Sandoval testified as a witness for the petitioners. The Court finds her testimony credible as a loving and supportive spouse to Dr. Sandoval and a caring and attentive mother to Allie, age eleven and Mikala, age eight. Her testimony regarding wanting to be a foster parent from age 20 but waiting until she had her own children was also credible, particularly when she told her daughter about fostering, i.e. "we are just the helpers, not the keepers".
She testified that she and her husband were first certified as foster parents in August of 2003 receiving three siblings for respite foster care during Christmas of 2003.
She testified that she was contacted by Senior Caseworker Stacy McVeigh regarding fostering Julia who was recovering from injuries at Sunnyview Rehabilitation Hospital.
She went to a meeting on or about April 1, 2004 at Sunnyview with hospital staff, Diana, Francis, Julia's grandparents, Concetta Hmura and Stacy McVeigh for Saratoga Department of Social Services and medical staff. Subsequently she attended physical therapy sessions for Julia at the Hospital and brought her daughters there to meet the baby Julia.
Upon being placed in her home, Michelle testified that Julia was "a light sleeper, a quiet baby, who cried upon waking and would hit herself and say "ow". Michelle ultimately stopped reacting to Julia's hitting, and she discontinued this behavior.
Michelle testified that Julia is very social and loves company. She rides her bike and enjoys the family swimming pool. Julia started walking at thirteen (13) months and her first words were "baby", "mama" and "dada".
During twice weekly visits with Diana, Julia refers to Diana as "mom" which Michelle has encouraged.
Julia is learning her colors, loves the "Wiggles" (an Australian children's music/entertainment group) and playing with dolls.
When Michelle's daughters are at school during the day Julia asks for them.
Of Michelle's extended family Julia is closest to Michelle's sister's son, David, age six, whom she calls "DD".
When asked about Julia's physical condition, Michelle reported no unexplained bruising that would "come and go" within a brief (hours or a day) period of time. These bruises were extensively identified and testified about in the preceding fact-finding trial with such bruises occurring while Julia was in the custody of her parents. Michelle testified that Julia has suffered no known fractures since she has been in the Sandovals' care. Michelle stated that Julia's occupational therapy was stopped at twelve (12) months of age due to Julia's "advanced progress".
 Department of Social Services caseworker, James Shoemaker, testified for the petitioner regarding his role as Julia's long term Foster Care caseworker. He testified primarily regarding the petitioners' attempts at outreach for a relative placement for Julia as an alternative to foster care.
Mr. Shoemaker testified that Diana provided him with several collaterals to contact - a Ms. Michelle Carter (an aunt), Francis' mother and father and Diana's mother. He also testified that Ms. Carter contacted him on March 10th and stated "no comment" in response to his questioning and then hung up. On March 11th a Ms. Wheeler, another relative, called him, but in [*5]response to his questions stated "no comment" and discontinued the phone call. Mr. Shoemaker testified regarding his attempts to interview Fran's father, another collateral contact recommended by Diana, but he declined to be interviewed, referring him to respondents' attorney, Eleanor DeCoursey.
It is noted that Ms. Carter petitioned this Court for custody of Julia, and a psychological evaluation was performed (at petitioner's expense). Mr. Shoemaker met with Ms. Carter and her counsel, Attorney Lawrence Dahlke. Thereafter and without explanation, Ms. Carter withdrew her custody petition. It is further noted that the petitioner did not support Ms. Carter's petition for custody of Julia since she could not bring herself to believe that Fran and Diana could have hurt Julia.
No other petitions for custody or foster care of Julia emerged until the petition of Mr. and Mrs. Flanagan was filed on October 11, 2004.
Supervised visits with the Flanagans and Julia was commenced and a homestudy was done. The Flanagan's homestudy was favorable. The Flanagan's first unsupervised visit with Julia took place on June 5, 2005. During the third week of June, overnight visits with the Flanagans commenced. These visits evolved to a roughly split week time-sharing schedule with the Sandovals. Supervised access for Francis and Diana and, to a lesser extent, Julia's siblings were established by arrangement with the petitioners and by orders of this Court.
Reports of the overnight visits between Julia and the Flanagans and their adult daughters was favorable and video tapes of those visits suggests to the Court positive, affectionate and legitimate bonding experience for Julia and the Flanagan family.
The Court notes that Julia came into DSS custody in March of 2004, yet the Flanagans filed for custody in September 2004, fully a six month lapse. It is unclear from the testimony why no action was taken by the Flanagans for six months. The Court is confident, however, that given the closeness of the Flanagan family to each other, Richard and Kathleen had knowledge of Julia's status for a relatively long time prior to the filing of their petition. This belief is reinforced by Richard's testimony as he has known Fran (his brother-in-law) longer than he has known his wife - more than 24 years.
Richard's testimony regarding why he and his wife became involved in this case is found to be patently honest and sincere. He states, "I'm a family man and the fact that Julia might be taken from the family - it shook us". When asked, "Why adopt Julia?" Richard replied, "to keep the family together no matter what". Richard's focus and dedication to the family unit is noted by the Court.
Diana Seaver testified on respondents' case. She testified in a manner mostly consistent with her testimony at fact-finding. She disclosed that she, her husband and Julia's siblings Sam and Lisa regularly attend counseling with clinician Al Wolfer, L.C.S.W. She testified, on direct examination, that Julia's grandmothers from both sides of the family, Grandpa "Joe" and Julia's cousins were able to visit with her while in foster care without any meaningful restriction. She testified regarding an August 15th visit between Julia, Sam and Lisa whereby Fran's mother was the "go-between". Multiple photographs of several visits were received into evidence without objection.
Diana testified that she and her husband appointed Richard and Kathleen Flanagan as guardians of their children with such action taking place prior to the commencement of this case.
[*6]
She opined that the Flanagans "will build bridges" and that she could stay away from Julia if Court ordered to do so.
Francis Seaver testified on the respondent's case. He testified that he had recently changed jobs to become a money manager for VanKamper Investments, Inc. (a subdivision of Smith, Barney). This new job requires mandatory travel daily to an office in Poughkeepsie, New York
He testified that his son, Sam, is in half-day kindergarten in the Shenendehowa School District and that children, Sam and Lisa, are "best buddies".
Fran testified credibly that "the most important thing is that the kids will be together, whether or not with him and Diana".
Fran continues to deny any culpability for Julia's injuries which is consistent with the position of his wife. This has been the position of Fran and Diana through the fact-finding phase of this case and through the dispositional phase. He complains about the "poor treatment" he and Diana have received from the petitioners stating "we are the best people they will ever deal with". He stated that he successfully completed all required anger management classes and most of the required parenting classes noting that Diana had gone to all of the parenting classes.
He acknowledged that he and Diana might relocate closer to Richard and Kathleen Flanagan. He opined that he and Diana might move out of Saratoga County and closer to where Richard, Kathleen and Julia will live if Richard and Kathleen were to "get custody" of Julia.
Francis stated with some level of upset and frustration - "it's obvious we can do no right for this department".
Dr. Laura Kagan, a child and family forensic psychologist, was called on petitioner's case. She was qualified as an expert in child psychology. She was retained by petitioner to assess Julia's attachment to her foster parents. As she did not have any meaningful contact or observation of the Flanagans, she was prohibited from offering any testimony regarding them.
Dr. Kagan opined that Julia had a primary attachment with Dr. and Mrs. Sandoval utilizing them as a "base of security". When the Sandovals explained new things found in Dr. Kagan's office during a one and one-half to two hour initial assessment period, Dr. Kagan quietly asked Lou and Kathleen and then both Sandovals to leave her office observing Julia's management and reaction to these circumstances.
When Michelle would leave the room Julia asked "Where is mommy going"? Lou replied, "She will be back in a minute". Dr. Kagan reported that Julia whined for a minute, which Dr. Kagan called "a moderate protest" which she said was the sign of an attached child. She testified that a similar reaction was had when Lou left the room. When Lou returned to the room, Julia reintegrated him in proactive play.
While engaging in observed play at Dr. Kagan's office, Julia played with a toy house with little people in it. She identified the little people within as those in the Sandoval household including herself. The Court draws no inference regarding Julia's attachment to the Sandovals from this example as the Court finds it at least mildly suggestive of a particular result.
Dr. Kagan opines that the Sandovals are Julia's "psychological parents". The Court has some problems with this conclusion since Dr. Kagan has no other parents to consider by way of comparison.
Dr. Kagan testified that attachment is a central issue in this case. She recited several [*7]barriers to attachment, specifically drug use, alcohol use, child abuse and neglect and separation. Plainly, these last two factors are present in this case.
Dr. Kagan testified that there are no numerical restrictions on the number of attachment figures a child may have, but there is a limit and hierarchy of quality attachment figures. She remarked that a child with a secure attachment figure is usually trusting and confident.
The greatest impact is Dr. Kagan's testimony that if Julia were to be separated from the Sandovals after what was then nineteen (19) months in their care, she would likely suffer "severe psychological injury" and "major attachment problems".
Contrary to Dr. Schockmel's contention that the primacy of contact for Julia was with her siblings, Dr. Kagan contends that Julia's primacy of contact is with her primary attachment figure, which would be her parents, psychological parents or primary care givers. After more than nineteen (19) months in their care, these are the Sandovals.
On cross examination, Dr. Kagan disclosed that the Sandovals stated that they would prefer not to have Julia visit with her siblings or the Seaver family. She acknowledged that the longer the "cycle of disruption" the longer it would take to reestablish a meaningful attachment for a child. She testified that Lou wanted to tell Julia "the truth" about her abuse but he did not. The Seavers, and to a lesser extent the Flanagans, deny responsibility for Julia's injuries, maintaining that Julia suffers from an undiagnosed medical condition.
This conflict of messages is crucial to the Court's assessment of this case. The Court is concerned that Julia will suffer profound psychological damage resulting from the "cognitive dissonance" caused by the information given to her by the Sandovals and that which is given to her by the Seavers and the Flanagans ,who to this day have not accepted responsibility for Julia's injuries.
It is this Court's primary and most critical responsibility in meeting Julia's best interest to reconcile this dissonance now and for Julia's future.
Licensed Clinical Social Worker Al Wolfer, (LCSW-(R)), the mental health clinician for Sam and Lisa Seaver, as well as Diana and Francis Seaver, testified on respondents' case. Mr. Wolfer's practice concentrates on adjustment difficulties, dysfunction, grief, loss and parenting issues. He has been qualified as an expert in social work by this and other courts.
Francis and Diana came to Mr. Wolfer upon receipt of this Court's decision finding that their daughter Julia was severely abused and that their two other children were derivatively neglected. He testified that they presented as situationally depressed and that those behaviors may now be categorized as grief.
Mr. Wolfer testified that Fran and Diana vehemently denied the allegations of abuse and neglect with Diana "relentlessly" searching the internet for a medical explanation for Julia's injuries. He offered that Francis and Diana suffered a deep sense of failure that they were unable to look after their own child.
He recommends Francis and Diana continue in psychotherapy for "grief work" noting some concern, however, that Francis and Diana lack any real anger in their presentation. He stated that as treatment progressed, some anger manifested itself, but he clarified that he remained concerned that there wasn't a more "balanced" presentation.
He confirmed that Fran and Diana are still convinced that Julia is medically undiagnosed. They told Sam and Lisa that Julia was sick and was with helpers. Mr. Wolfer believes that this is [*8]a good message for the kids. However, this explanation is discordant with the siblings' visual impression of a healthy, vigorous Julia during sibling visits. This discordance can only become more obvious to the children over time.
Mr. Wolfer opined that Julia was imprinted on the consciousness of her siblings even though she was not often physically present. He characterized Fran and Diana's supervised visit with Julia (a fortunately unobtrusive observation) and the siblings as safe, proper and appropriate with both parents connecting with all three children.
Mr. Wolfer specifically noted Julia and Lisa engaging in parallel play (playing together). All of the children competed for their parents' attention in an age appropriate manner.
He testified that Julia referred to Diana as "mommy" and Fran as "daddy".
Mr Wolfer recommended that it would be best, if possible, to keep all of the kids close to their family of origin and to attempt to maintain as much normalcy as possible. He also opined that if the relationship between Julia and her siblings was severed, it would be "very hard" psychologically, raising guilt and loyalty issues in the future.
On cross examination Mr. Wolfer disclosed that his only information source was his patients Fran and Diana. When asked about Munchausens by Proxy cases, he acknowledged that they were hard to assess without an admission, stating further that one must look for unexplained medical conditions. He offered the people who suffer from Munchausens by Proxy do well on MMPI - type tests and lie detector tests; further noting that respiratory issues, i.e. choking and asphyxiation are common in Munchausens by Proxy cases.
Kathleen Flanagan (Richard's wife) testified on respondents' case. She testified on her marriage to Richard of 24 years and that she was a stay-at-home mom.
She testified that she first met Julia in November of 2004 and as such has actually had less contact with Julia than the Sandovals. Kathleen described the routine at the Flanagan household during Julia's overnight visits which appeared to be enjoyable for everyone.
She testified excitedly about her plans for Christmas with Julia where thirty people "the entire family" would be invited to she and Rich's house to celebrate the holiday.
When asked by Attorney DeCoursey what she would do if Fran and Diana come to her house to see Julia, in violation of a Court order, she stated that she would call the police. When asked how would she answer Julia's questions about why she is living with them and not with her parents, Kathleen answered that she would get professional counseling to help answer Julia's questions.
When asked what result she would like to see from this case if Julia could not return to her parents, Kathy's heartfelt and credible reply was, "I would like to see the siblings grow old together". She compared her children, Catharine and Denise born twenty (20) months apart, to the Seaver siblings, stating, "I want the same relationship for Julia, Lisa and Sam that my children have".
The Court finds that there is no guile or strategy in Kathleen's testimony, only what is in her heart.
The respondents called two prominent physicians on their case, Dr. Leon Root and Dr. Thomas Lehman. Both testified via videotaped depositions conducted on December 7, 2005 at the hospital for Special Surgery in New York City. Counsel for the petitioners and respondents conducted the depositions in person and the Court received and reviewed the videotape and the [*9]transcript of same in full without objection. Objections to questions asked of the two doctors were noted and preserved as part of the transcribed record.
Dr. Lehman is a licensed physician with 31 years of experience. He presently serves as Chief of Pediatric Rheumotology at the Hospital for Special Surgery. He is board certified in pediatrics and pediatric rheumotology. Dr. Lehman was retained as an expert by the respondents to review the medical and hospital records of Julia Seaver from birth, meet with Mrs Seaver, examine Julia and make a report of his opinion and findings. A preliminary report was prepared without comprehensive records or an examination of Julia. A complete report was prepared by Dr. Lehman upon a fuller review of Julia's records and a physical examination of Julia. That report, dated April 28, 2005, as well as the preliminary report was received into evidence. Dr. Lehman opines that the review of Julia's fractures results in etiology which was unclear. Upon interview with Julia's parents and a review of the medical record he does not believe Julia suffered from "inflicted trauma". He notes that upon record review she does not demonstrate "clinically obvious features of osteogenesis imperfecta or other rheumatic disease". Dr. Lehman confirms that "current levels of testing do not allow detection of less common variants of osteogenesis imperfecta and other conditions which may cause an unusual frequency of fractures such as have occurred with this child". On direct examination, Dr. Lehman concluded that he believed Julia was one of the 10% of individuals who suffer from osteogenesis imperfecta who do not test positive with the presently available testing. He testified that all of the commonly available testing for osteogenesis imperfecta and other collagen diseases was performed on Julia.
He testified that in ruling out child abuse as a finding for Julia he looked beyond the clinically unexplained geneses of Julia's fractures to the nature and character of the attentiveness Julia's parents provided to her through repeated and regular visits to Julia's pediatrician.
The Court recalls from testimony at fact-finding that despite diagnosing multiple fractures during a brief period of time Julia's pediatrician, Dr.Sood, a mandated child abuse reporter, never called any of these fractures in to the NYS Child Abuse and Maltreatment Hotline. The Court also recalls Dr. Sood's trial testimony regarding her failure to report Julia's fractures. Dr. Sood concluded that she did not think that Julia's parents presented as people who would hurt their child. The Court is concerned that a medical record reflecting Dr. Sood's reaction regarding her patient gave Dr. Lehman greater emphasis on the "familial context" for assessing abuse than the facts of this case actually warrant. Dr. Lehman affirmed, on cross examination, his reliance on his impression of Julia's parents helped shape his opinion that Julia was not an abused child.
Further cross examination of Dr. Lehman revealed that upon record review and physical examination Julia presented with none of the external indicia of osteogenesis imperfecta such as a triangular shaped face, irregular dentition, wormian bones or other bony morphology.
Dr. Lehman also confirmed that long bone fractures, posterior rib fractures and a skull fracture in a child under four months of age could be suggestive of child abuse. These are all injuries presented in Julia's records and established in trial testimony.
Continuing on cross-examination, Dr. Lehman acknowledged that Julia's Albany Medical Center records from December 2003 reported that Julia presented with bilateral bruising around her cheeks and jaw, bruising on her chest in the area of her seventh rib on the left side and that Julia's left arm was swollen in the area where she had suffered fractures of her radius and ulna.
When asked if the great number of fractures that Julia suffered could be indicative of [*10]child abuse, Dr. Lehman replied ". . . could' is certainly correct". He further confirmed that much of his conclusion that Julia had not suffered child abuse was based upon his impression of Julia's parents. He agreed that if the information presented to him by Julia's parents were incorrect, his ultimate conclusion regarding child abuse would be different.
In that regard it is noted that Dr. Lehman was unaware of the trial testimony of Dr. Sanchez' treatment to Julia's episode of pulmonary edema arising from what Dr. Sanchez concluded was a "smothering" incident caused by an external obstruction of Julia's breathing, nor was he aware of the testimony of Dr. Gerald O'Brien of the Emergency Department of Ellis Hospital who also opined that Julia suffered from a smothering incident.
Dr. Lehman acknowledged that smothering type incidents with children are often coincident with child abuse. He confirmed that he performed every medically appropriate test that Julia's mother Diana asked him to perform. The results of all available testing could not establish that Julia suffered from osteogenesis imperfecta, any collagen disorder, any rheumatic disorder or any genetically discernible disorder.
His testimony confirms that Julia presented with no external manifestations of osteogenesis imperfecta and that all medical testing failed to confirm any illness, disease or defect which would cause Julia's fractures.
Dr. Lehman's testimony strongly suggests that he was not provided with all of Julia's medical records and was unduly influenced by the presentation of Julia's parents upon interview and upon Fran and Diana's regular pediatric follow up with Dr. Sood during the period where Julia's injuries allegedly occurred. The Court recalls that Dr. Sood was similarly impressed with the Seavers' presentation and attention to Julia's medical needs and took no responsible protective action to initiate investigation of Julia's multiple injuries.
This Court cannot permit Julia's safety to be controlled by such impressions. The Court finds Dr. Lehman's testimony and opinion therefrom to be neither incisive or dispositive of the outcome of this case.
Dr. Leon Root was called as an expert witness on respondent's case. Dr. Root is a Board certified orthopedic surgeon. He is a member of the American Academy of Orthopedic Surgeons, The American Orthopedic Association (an honorary group) and the Pediatric Orthopedic Society of North America. Dr. Root is also a member of the American Academy of Cerebral Palsy and Developmental Medicine serving as president of that group in 1998. He obtained his medical license in 1955 and presently serves as a senior attending physician at the Hospital for Special Surgery with an additional practice at the New York Presbyterian Hospital. Dr. Root is the Director of Rehabilitation at the Hospital for Special Surgery. Dr. Root's lengthy curriculum vitae was received into evidence. He testified that he is on the Medical Advisory Board of the Osteogenesis Imperfecta Foundation. He testified that he served as Chief of Pediatric Orthopedics at the Hospital for Special Surgery from 1970 to 1997.
On direct examination Dr. Root testified that there are now seven categories of osteogenesis imperfecta with some variations within each category. He also stated that these categories may overlap. He testified on detail regarding the physical manifestations of osteogenesis imperfecta in addition to brittle bones.
Dr. Root testified on direct examination that a fibroblastic study which tests a patient's collagen will reveal the existence of osteogenesis imperfecta in 85% to 90% of all cases. It is [*11]established that this testing and further genetic testing on Julia did not reveal any osteopeorosis imperfecta or any collagen or genetic disorder.
Having confirmed on direct testimony that Julia showed no indicia of osteogenesis imperfecta through collagen testing or recognized genetic testing (as did Dr. Lehman), Dr. Root opined that Julia might suffer from a condition called "transient osteoporosis". Dr. Root's deposition testimony on this subject follows:
A. Osteopenia, osteoporosis. There is a condition called transient osteoporosis, which can occur in young people, adolescent osteopenia osteoporosis. And it can involve one limb. It can involve many limbs. We don't usually think of that as a form of brittle bone disease or osteogenesis imperfecta. It's sort of a different thing. However, there are some people - there's a doctor in England who's written about this. I don't recall his name at this moment, who actually feels that some of the children can have a condition which is transient osteoporosis or osteopenia or transient osteogenesis imperfecta, where they have brittle bones at birth and they fracture and then they get better and then they seem to get better through life. Now, what's happening there, what that metabolic abnormality is, we don't know yet, but there is something reported in the literature than that can happen.
Q.Is that recognized by an portion of the medical community?
A.I think it's still somewhat disputable. I think some people recognize it, some don't. I don't think it's uniformly accepted, but I think honestly what's going to happen is we're going to find that this will be one of those variations of this as we investigate it for the future.
Q.How do you feel about it?
A.I think it exists. I think it exists.
Dr. Root prepared two reports for the respondents, the first on March 1, 2005 and the second on May 19, 2005. He testified that the first report was prepared based solely upon interviews with Julia's parents and the medical records that they provided. The May 19th report was prepared upon physical examination of Julia and further records review. Dr. Root testified that Osteogenesis Imperfecta occurred in one out of ten thousand live births. In reading his preliminary assessment that Julia was not a victim of child abuse, he relied, as did Dr.Lehman, upon the parents returning to the same pediatrician for medical care and that Julia did not present with any real bruising. Dr. Root's testimony regarding the basis for his conclusions follow:
BY MR. ENGLERT: (Respondents' deposition counsel)
Q.Now, we'll go back to your preliminary diagnosis after you received the history that is contained in your March 3 report based on the information you have at that time.
A.The information I have at that time and this is just from the parent's history and review of all the records and looking at everything, I mean I looked at the fact that this child was [*12]constantly taken to the doctor, any time they had a problem, the parents took her to the doctor. They took her to the same doctor. There was consistency of what they did. Usually parents and children with child abuse don't go back to the same emergency room, don't go back to the same doctor. Of course, they are aware of what's happening and they don't want that on record. So they do things differently but here is a parent, a family that has that. They have two older children that have never had a problem. So you have to put it all together. So my feeling was that this does not represent a case of child abuse. This child probably has some brittle bone disease. Whether it's truly osteogenesis imperfecta or a variant of it, I can't prove, but just looking at everything that's happened with this child and there's multiple fractures the child sustained, without apparent real bruising or anything else that anyone's been able to document, I have to say that this child has an abnormality of the bones, brittle bones, which caused it and it was not a case of child abuse and that's the conclusion I came to.
The Court notes that Julia's medical records are replete with notations of bruising at the sites of Julia's fractures and that there was no clinical, or observed indicia of osteogenesis imperfecta by any test performed. The Court finds that Dr. Root's preliminary diagnosis unduly relies on Julia's parents' loyalty to Dr. Sood who took no action in reporting Julia's multiple fractures to child protective authorities. It is noted that Dr. Root testified on direct examination that further testing for Julia was not necessary.
On cross examination Dr. Root confirmed that in 1996 in Matter of Matthew Dee, 168 Misc 2d 997, the Hon. Nora Freeman ruled that Dr. Root was not an expert in child abuse. Dr. Root acknowledged that corner fractures, certain rib position fractures and skull fractures (all diagnosed for Julia) were atypical for osteogenesis imperfecta but were not unknown for that disease.
Significantly, Dr. Root testified that he cannot make any objective findings that Julia suffers from osteogenesis imperfecta and as a result he offered the diagnosis of transient osteoporosis stating that such disease or disorder is not generally accepted in the medical community. Under the analysis required and accepted under Frye v United States, 293F. 1013, the Court gives no evidentiary weight to Dr. Root's report.
In rebuttal to the testimony of Dr. Lehman and Dr. Root, the petitioner called Dr. Paul Kleinman as an expert witness. Dr. Kleinman testified via videotaped deposition on January 18, 2006. Direct examination was conducted by petitioner's counsel and cross-examination by counsel for the respondents. Transcripts of the deposition were received into evidence and all objections were reserved and noted in the transcribed record.
Dr. Kleinman is a pediatric radiologist with offices at The Children's Hospital of Harvard University in Boston (where the deposition took place). He has been licensed to practice medicine since 1975. Dr. Kleinman's curriculum vitae was received into evidence. He is a professor of Radiology at Harvard Medical School and is board certified in radiology and pediatrics and most recently in pediatric radiology. Dr. Kleinman was in the first group to become board certified in this sub-specialty ten years ago.
He testified that for the last 15 to 20 years his principal interest has been in the field of child abuse. He is the author of a text entitled "The Diagnostic Imagery of Child Abuse" which [*13]is noted in his vitae. In connection with diagnosing osteogenesis imperfecta, he is called upon to review x-rays of children and either "rule in" or "rule out" osteogenesis imperfecta.
Dr. Kleinman testified that he was familiar with the term "temporary brittle bone disease" and that such a disease or disorder was not a generally accepted by the medical community.
 He testified that with respect to fractures seen in infants, particularly young infants, bruising is frequently absent. He offered detailed testimony regarding the medical literature pertaining to the distribution of fractures found in infants, distinguishing between those fractures found in infants under one year of age such as Julia and those infants older than one year.
Dr. Kleinman's testimony on this subject follows:
 And if one looks at a child above a year of age, children who are walking, and one looks at the literature, fractures of the shafts of the long bones are actually the most common fractures that we see with child abuse. However, when one looks at infants, that is children under a year of age, particularly young infants who are not ambulatory, if one looks at the distribution of fractures in that age group, the fractures are different the distribution of fractures is different.
In a study that we did a few years ago where we looked at approximately 30 infants who had died with signs of child abuse, 90 percent of the fractures that we found in that study involved either the rib cage or involved the ends of the bones, the metaphyses of the long bones, that occur in a pattern that is seen principally in that age group, and 90 percent of the fractures fall into those sorts of injuries of the metaphysis, on the ribs, and only about 10 percent of the fractures occurred at other sites. It is very different when one is looking at when one is looking at young infants as compared to the ambulatory child who is over a year or so.
Now rib fractures that you have seen in cases of suspected child abuse, would they be associated with a particular portion of the rib?
They can occur anywhere around the ribs, from the very front of the ribs to the very back of the ribs, but again if one looks at the distribution of these fractures in cases of child abuse, they tend to be more common toward the back of the ribs, particularly as you get closer to the spine.
Dr. Kleinman testified that he was requested to review the x-rays and reports regarding Julia Seaver by the petitioner, Saratoga County Department of Social Services. These records and x-rays included the records of Julia's treatment at Albany Medical Center from November and December of 2003. Based upon a review of these records, he prepared a letter report of his findings, dated March 11, 2004. This report was received into evidence.
The report makes findings of a total of fifteen (15) fractures of the skull, the left radius and ulna, the tip of the right clavicle and fractures of the left 5th, 6th and 7th ribs (lateral aspects) and of the 7th and 8th ribs (posterior aspects) and of the right 5th, 6th and 7th ribs on the right side (posterior aspect). Also identified by Dr. Kleinman was a "classic metaphyseal lesion pattern" on the distal (lower) ends of Julia's right femur and the left tibia.
It is noted that Dr. Kleinman had reviewed copies of the x-rays from Albany Medical Center. He was subsequently provided by petitioner with the original films from the hospital. He testified that this review of the original x-rays did not alter his professional opinion or his [*14]conclusion and findings.
Dr. Kleinman's testimony follows:
Q. Now, Doctor, based upon your review of the imaging studies from Albany Med and from Dr. Slavin's office and a review of the clinical information from Albany Med, did you receive clinical information from Dr. Slavin's office?
A. I believe I did. Yes.
Q. And based upon your review of all of that and your education, training, and experience in the field of pediatric radiology and also related fields that you have discussed, did you reach a determination with a reasonable degree of medical certainty as to what you believe to be the cause of the fractures that you have discussed with us this morning?
A. Yes.
Q. And what was your determination?
A. I believe that the - - my opinion was that these injuries are inflicted or were inflicted.
Q. And what is there about the injuries, the fractures, that led you to that determination with a reasonable degree of medical certainty?
A. We have a young infant who has 15 fractures. Some of the fractures are what we would call nonspecific and could conceivably occur if a child was in a motor vehicle accident, fell from a substantial height, in particular the fractures of the forearm.
We then have fractures involving the rib cage, and particularly fractures that are near the spine, and we have fractures in the metaphyses that conform to a so-called classic metaphyseal lesion pattern. These are fractures which carry a very high association with abuse.
When we encounter fractures in this pattern and distribution on x-rays which are otherwise normal, we will then make a determination that the fractures are consistent with inflicted injuries.
Q. And in the course of your review of all of the aforementioned information, did you find any features to suggest osteogenesis imperfecta or some other metabolic bone disease?
A. I did not.
Q. And would that include also temporary brittle bone disease?
A. Since I don't believe that it is a disease, then that would include that as well.
During a vigorous cross-examination Dr. Kleinman was asked if he ever testified in Court [*15]on behalf of a parent wrongly accused of child abuse. He testified that he had not. He added, however, that he had been involved in many cases of wrongly accused parents or caretakers whose cases did not go to Court because his assessment and opinion helped to overturn the initial allegations of abuse. Dr. Kleinman stated that he regularly involves himself in child abuse defense cases and that none of those cases had actually gone to court and were dismissed to the best of his knowledge.
On Cross-examination, respondent's counsel propounded a series of hypotheticals to Dr. Kleinman asking each time if a hypothetical results would change Dr. Kleinman's opinion and finding. Dr. Kleinman stated each time that the hypothetical proposed would not change his opinion.
One hypothetical is found particularly disturbing by the Court as it is premised upon a child with fractures, and a clear diagnosis of osteogenesis imperfecta. This is a meaningless hypothetical for the witness' consideration as there is no clinical evidence whatsoever that Julia, the only subject of these proceedings, suffers from osteogenesis imperfecta.
Continuing on cross examination, Dr. Kleinman testified regarding his understanding of the degree of exclusion which may be had by scientific testimony for osteogenesis imperfecta. He testified that the non-diagnosable rate was 10% and the following colloquy took place starting with questioning from respondents' counsel:
Q. Now you have indicated 10 percent. Are you aware that generally-accepted medical writings indicate that the test - - and in fact the people who do the test - - say that it is only 85 percent accurate?
A. Well, I - - Dr. Byers, who is in care of the lab and one of the world's experts, and I have served on panels at various meetings, and during those discussions and their presentations, the current view is that if both tests are negative, both the genetics test done in Tulane and the collagen testing done in Seattle, the number is more in the range of 90 percent or higher.
Q. Okay. So, in other words, the information he sends out is not accurate? Is that what you are telling me?
A. No.
Q. Like a private conversation?
A. No. What he sends out - - what he may send out is a standard letter based upon his testing.
Q. Okay.
A. But what I have said - -
Q. So - -
A. - - is that the testing - -
[*16]
Q. Doctor - -
A - - done at both Tulane and Seattle - -
Q. Doctor - -
A. - - if they're both negative - - if they're both negative - -
Q. I understand.
A. - - maybe you are not getting that point - - if both tests are negative, then the likelihood of OI becomes less than if one is negative. If you have two tests to diagnose, some will pick up cases that the other one does not. So obviously the percentage is going to go up. It is not going to stay at 85 percent.
Q. My question to you, Doctor, is: Have you personally seen patients who test negatively but you know that they have OI.
MR. PELAGALLI: Objection.
Asked and answered.
Q. And I think your answer was - -
A. I said - -
Q. - - I don't know; I know it happens.
A. - - I would presume that I did - - that I have - -
Q. Okay.
A. - - because we know it happens in 10 percent of cases.
Q. Is the answer "I don't know"? If the answer is "I don't know," that's okay.
A. I don't know.
The Court finds Dr. Kleinman's testimony to be unrebutted and unimpeached upon cross-examination.
Regarding the testimony of the three medical experts, the Court finds Dr. Kleinman's testimony and opinion to be credible and ultimately dispositive of the cause of Julia's injuries.
The testimony of Drs. Root and Lehman are given much less weight and are not [*17]dispositive as to the cause of Julia's injuries. Even Dr. Root confirms that his diagnosis of transient osteopenia or temporary brittle bone disease is not a diagnosis generally recognized in the medical community. Dr. Kleinman opines that this disease does not exist.
There is no medical evidence, either upon physical examination or genetic or collagen testing that supports a finding of OI or any other identified medical disorder explaining Julia's injuries.
The Court, therefore, finds that the respondents, Julia's parents, have offered no medical explanation for the injuries suffered by their daughter which occurred when she was exclusively in their care. The Court further finds that Fran and Diana are responsible for inflicting those injuries.
The controlling statute in this dispositional phase of this case is Social Services Law Section 384-b(f) which provides:
Upon a finding pursuant to paragraph (a) or (b) of this subdivision that the child has been severely or repeatedly abused by his or her parent, the court shall enter an order of disposition either (i) committing the guardianship and custody of the child, pursuant to this section, or (ii) suspending judgment in accordance with section six hundred thirty-three of the family court act, upon a further finding, based on clear and convincing, competent, material and relevant evidence introduced in a dispositional hearing, that the best interests of the child require such commitment or suspension of judgment. Where the disposition ordered is the commitment of guardianship and custody pursuant to this section, a permanency hearing shall be completed pursuant to section one thousand fifty-five a of the family court act immediately following, but in no event later than sixty days after, the earlier of the court's statement of its order on the record or issuance of its written order. A notice of the permanency hearing and a petition and/or report, as directed by the court, shall be filed and provided to parties, law guardian and individuals required to be notified in the manner and according to the schedule specified by the court. Subsequent permanency petitions shall be filed pursuant to section one thousand fifty-five-a of the family court act no later than six months after completion of the last permanency hearing, unless the court directs an earlier filing, and each subsequent permanency hearing shall be completed within sixty days of the filing of the petition.
Having heard all of the testimony and having assessed the relative credibility of all of the witnesses and having reviewed all of the exhibits the Court finds as follows:
1. Julia Seaver be placed in the custody and guardianship of the Saratoga County Department of Social Services.
2. Petitioner's motion to terminate reasonable efforts to reunify Julia with her parents pursuant to the FCA 1039-b is granted and efforts to reunify Julia with her parents Francis and Diana Seaver be terminated and Francis and Diana Seaver's parental rights to Julia are terminated on grounds of severe abuse.
3. Petitioner's Docket Nos. B-01469-05 and B-01470-05, which are petitions to terminate the parental rights of the respondents to their daughter Julia Seaver, are granted.
4. Julia Seaver's permanency plan be solely "free for adoption".
5. Visitation and access by and between Julia and the respondents be terminated effective immediately and a permanent order of protection be entered to that effect until Julia attains [*18]eighteen (18) years of age.
6. Sibling visitation between Sam, Lisa and Julia shall continue by and through the Flanagans as per orders of this Court until such time as a hearing on the completion of adoptions for Julia Seaver will be heard which day shall be May 2, 2006 at 9:00 AM. when Julia's final permanency hearing shall also be heard.
7. As regards Sam and Lisa Seaver, a three year order of disposition shall be entered as follows:
Respondents shall allow Children Services workers to make announced and unannounced home visits and allow entry into and throughout the home where the respondents and the children are residing.
Respondents shall allow Children Services workers private access to the children, Sam Seaver and Lisa Seaver, for private interviews at home, at school and/or daycare.
The respondents shall cooperate with the Department of Social Services, such cooperation to include, but not be limited to the signing of any and all releases as requested.
And it is further
ORDERED, that the legal surname of the respondents is hereby changed back to the respondents' real name, Allen, and that for the purposes of preparing this Order and future Court documents, the fictitious name of Seaver shall no longer be used when referring to the respondents, Francis and Diana Seaver, and it is further
ORDERED, that for a period of THREE (3) years, to expire on February 28, 2009, Francis and Diana Seaver shall be required to comply with the following terms and conditions of an Order of Protection which will be issued in conjunction with this Order:
1. The respondents shall allow Child Protective workers to make announced and unannounced home visits to the respondents' residence.
2. The respondents shall allow Child Protective workers private access to the children Sam Seaver and Lisa Seaver, for private interviews at home, at school and at daycare.
3. The respondents shall allow Child Protective workers entry into and throughout the home for visits where the respondents are residing.
4. The respondents shall cooperate with the Department of Social Services, such cooperation to include, but not be limited to, signing any and all releases requested by the Department of Social Services.
5. Respondents shall refrain from conduct toward their children Sam and Lisa that would constitute Disorderly Conduct, Harassment in the 1st Degree, Harassment in the 2nd Degree, Menacing in the 2nd Degree, Menacing in the 3rd Degree, Reckless Endangerment, Assault in the 2nd Degree, Assault in the 3rd Degree and/or Attempted Assault as defined in the New York State Penal Law.
SO ORDERED.
Dated: Ballston Spa, New York
 April 10, 2006______________________________
HON. GILBERT ABRAMSON
Family Court Judge
[*19]